DECISION
PER CURIAM.
This case comes before the Ho-Chunk Nation Supreme Court on appeal of the Trial Court’s Order (Final Judgment) in CV09-02, dated October 1, 2009. Oral arguments were heard on February 27, 2010 before Chief Justice Mary Jo Hunter, Associate Justice Dennis Funmaker, and Associate Justice Joan Greendeer-Lee. Attorney Wendi A. Huling appeared for tin-appellee. Attorney James C. Ritland appeared for the appellant.
FACTS
The Food and Beverage Department of the Ho-Chunk Nation hired the appellant, Daniel Topping, in November of 2007 as a counter server/ cashier. At this time, Mr. Topping’s employer was unaware of his bipolar disorder. See Decision, GRB-062.08T at 1, line 22-24.[1] On February 13, 2008, Dr. Ben Boardman wrote a letter to Mr. Topping’s employers informing them that Mr. Topping had told him that he was suffering from bipolar disorder and offering to discuss Mr. Topping’s disorder with them. Dr. Boardman also asked that Mr. Topping’s disorder “be taken into consideration if any problems should arise at work.” Admin. R.: Ho-Chunk Health Care Center (February 13, 2008) at 30.
*391 Over the first half year of his employment, the snack bar where Mr. Topping worked received about 15 written complaints from both the customers and from Mr. Topping’s coworkers about his behavior. Admin. At: at 27 67. Mr. Topping told his supervisor that he would not take his medications for his bipolar disorder because they would “make him act like a zombie and affected his sex life.” See Decision, GRB-062.08T at 2, lines 4-6. During this time, Mr. Topping’s employer does not appear to have contacted Dr. Boardman to learn more about Mr. Topping’s bipolar disorder or to seek advice about how to best handle his disturbances at work.
On June 6, 2008, Mr. Topping lost a sports card that he considered valuable. He questioned his co-workers about its disappearance, but eventually found the card on his person. After locating the card, he re-approached one of his coworkers, Ashley Servant, whom he had earlier questioned about the card. According to Ms. Servant’s complaint, Mr. Topping told her that he had found his baseball card but “that he doesnt [sic] mess around hes [sic] a serious person.” When Ms. Servant asked him to get away from her, he refused. He then told her that “this is me I’m serious you’re my buddy” and shook her hand. As he turned away from her, she alleges that he started swearing and said “Next time I’ll fucking kill you.” Admin. R.: Majestic Pines Casino, Bingo & Hotel Voluntary Statement Farm, (June 6, 2008) at 15-16.
Mr. Topping does not deny the conversation took place, though he does deny saying that he would kill Ms. Servant and claims that the conversation was congenial. However, he also admitted that when he is in one of his manic states, he does not always remember everything that happens and sometimes says things of which he is not cognizant. Admin. R.: Ho-Chunk Nation Incidence Re-parting Form, (June 6, 2008) at 12-18. Decision, GRB-062.08T at 3, lines 1-9.
Mr. Topping was immediately escorted out of the building by security. Shortly thereafter, his employer terminated him for violating the Ho-Chunk Nation Employment Relations Act (ERA) 6 § 5.20(e)(14) and (19). His termination was effective as of June 10, 2008. Admin. R.: Ho-Chunk Nation, Employee Summary Form, at 1. He timely appealed his termination to the Grievance Review Board (GRB) on June 11, 2008. See Decision, GRB-062.08T at 1, lines 4-6.
A second doctor, Gail Tasch, wrote a letter to the GRB stating that Mr. Topping’s behavior during this incident may have been caused by his bipolar disorder and inviting the GRB to contact her with questions. Brief of Petitioner, CV 09-02 (HCN Tr. Ct. Mar 27, 2009) exhibit B. The GRB does not appear to have consulted Dr. Tasch during the termination hearing. Though the board admitted to not understanding Mr. Topping’s disorder, they nonetheless decided to uphold Mr. Topping’s firing. They do not seem to have made an effort to understand his bipolar disorder or to look for ways to accommodate his disorder instead of firing him. The GRB found that:
The Grievant’s most compelling element of his presentation deals with a condition that he feels prompted him to behave in the matter that led to his termination. Although the Board finds a great weakness in their clinical understanding of his condition, the Grievant’s testimony provided only a reason for his behavior, not an excuse. Decision,, GRB-062.08T at 4 lines 21-24.
The GRB held a hearing on December 18, 2008 and issued its decision against Mr. Topping on December 29, 2008. Mr. Top *392 ping filed a timely Petition for Administrative Review with the Ho-Chunk Trial Court on January 14, 2009. The Trial Court handed down its decision against Mr. Topping on August 6, 2009. The Trial Court based its finding upon the fact that GRB’s decision was not arbitrary or capricious and that there was no clear lack of evidence supporting the GRB’s decision. The Trial Court dismissed Mr. Topping’s complaint that his disability had not been taken into account by noting that the GRB had acknowledged Mr. Topping’s disability. Daniel Topping v. Ho-Chunk Nation Grievance Review Board, CV 09-02 (HCN Tr. Ct., Aug. 6, 2009). The appellant filed a Notice of Appeal on October 1, 2009. The Supreme Court accepted the appeal on October 16, 2009.[2] Oral arguments were held February 27, 2010.
STANDARD OF REVIEW
The standard of review used by this court for reviewing a Trial Court order of an administrative review is abuse of discretion as laid out in Sharon Williams v. HCN Insurance Review Commission, SU 08-01, 2008 WL 9878250 (HCN S.Ct., Oct 29, 2008). “This standard is highly deferential to the Trial Court and the Supreme Court will uphold such findings absent a showing that the Trial Court somehow failed to make a necessary finding, ignored the great weight of the evidence, or otherwise abused its discretion in making findings of fact” Hope B. Smith v. Ho-Chunk Nation, SU 03-08 (HCN S.Ct., Dec. 08, 2003) at 4. “However, the Supreme Court reviews questions of statutory and Constitutional interpretation de novo.” Id. at 5.
ISSUES
1.Whether the Trial Court erred in determining that Daniel Topping was given his due process rights before being terminated.
2. Whether the Trial Court erred in determining that the employer properly terminated Daniel Topping despite the fact that the employer did not take his mental illness into account during the termination.
3. Whether the Trial Court erred in agreeing with the GRB that the employer’s suggestion that Daniel Topping seek other employment with the Nation was an appropriate alternative.
4. Whether the Trial Court erred by not discussing the fact that Daniel Topping had completed his probation period and therefore, his employment could not be terminated except for good cause.
DISCUSSION
Did the Trial Court err in determining that Daniel Topping was given his due process rights before being terminated?
“Supervisors imposing discipline shall afford Due Process to the employee prior to suspending or terminating any employee.” ERA, 6HCC § 5.31(a). Due process requires that an employee be told the grounds on which he is being punished. It also requires that an employee be given a meaningful chance to be heard and to state his defense before he can be deprived of his property rights in his job or in his pay. Gary Lonetree Sr. v. John Hoist, as Slot Dir. et al, CV 97-127 (HCN Tr. Ct., Sept. 24, 1998) at 10-12. Furthermore, the right to be heard can only be satisfied if the employee is heard by someone with authority over the decision to discipline *393 him. Sherry Fitzparrick v. Ho-Chunk Nation et al., CV 04-82 (HCN Tr. Ct., Feb. 20, 2006) at 16. Finally, “the result of the hearing cannot be a foregone conclusion.” Id. at 15.
On June 8, 2008 two days after the incident Mr. Topping’s supervisor Tammy Elliott spoke with Mr. Topping on the telephone and asked him not to come into work until further notice. During this conversation Mr. Topping told Ms. Elliott his version of the events involving Ms. Servant. Admin. R: Majestic Pines Casino, Bingo & Hotel Voluntary Statement Form at 14. Mr. Topping then filed a statement with his version on the event on the morning of June 10, 2008. Admin. R: Ho-Chunk Nation Incident Reporting Form, at 12-18. Ms. Elliott signed and dated the forms requesting his termination the same day. Admin. R.: Ho-Chunk Nation, Disciplinary Action, Form at 5-8.[3] These facts support the GRB’s conclusion that the Food and Beverage Department had “given a crystal clear presentation from management that all elements of the disciplinary process designed to ensure the rights of employees have been met.” Decision, GRB-062.08T at 10-11. Hence, the GRB decided that Mr. Topping’s employer had afforded him both notice and a chance to be heard. As there is no evidence that this decision is capricious, arbitrary, or unsupported by the facts, the Supreme Court must let it stand. However, while it appears that his supervisor went through all of the required steps of notice and a chance to be heard before terminating Mr. Topping, she still erred in not considering Mr. Topping’s disability in her decision to fire him.
Did the Trial Court err in determining that the employer properly terminated Daniel Topping despite the fact that the employer did not take his mental illness into account during the termination?
HCN Constitution. Art. X § 1(a)(8) provides that no person shall be deprived of their “liberty or property without the due process of law.” The ERA 6HCC § 5.5(a) provides that, in terms of employment, the Ho-Chunk Nation will not discriminate against anyone for reason of a disability. This act states that:
a. Equal Employment Opportunity. With the exception of Ho-chunk Preference in Employment as set forth in paragraph (b), below, it will be a violation of this Act to discriminate based on an individual’s sex, race, religion, national origin, pregnancy, age, marital status, sexual orientation, or disability, [emphasis added]
In order to understand exactly what protections for the disabled these statements demand, the courts should look to the Ho-Chunk common law tradition of woigixate.
The concept of woigixate requires the GRB and the disabled employee’s supervisor to try to understand and appreciate what the disabled employee is experiencing and what the nature of his disability is before dismissing him. Woigi-xate requires that all people be treated with respect and compassion and that no one should be treated badly or demeaned because of their situation. Not just disabled people, but all people, should be treated with woigixate. Hence, woigixate *394 requires reasonable attempts at accommodating a person’s disability rather than just throwing the employee out like a broken tool.
In the situation with Mr. Topping, woigixate required active attempts by his employer at both understanding and accommodating Mr. Topping’s disability before firing him. Mr. Topping’s supervisor should have contacted Mr. Topping’s physician when he first received complaints about Mr. Topping’s behavior for advice about how to help Mr. Topping minimize the effects of his disorder on his job performance. Before firing Mr. Topping, the employer had an obligation to talk to a physician about Mr. Topping’s disorder so that he could be sure that no further accommodations were possible. The ERA requires that “discipline will normally be progressive.” ERA 6HCC § 5.31(a). However, Mr. Topping’s discipline was not in fact progressive because Mr. Topping’s supervisor just repeatedly criticized his behavior without ever attempting to contact a physician in order to learn how to effectively correct Mr. Topping’s behavior problems stemming from his disorder. Repetitive is not the same thing as progressive. Furthermore, the appellee alleges that the severity of the incident made both Mr. Topping’s disability and the need for progressive discipline irrelevant. However, there is no way the GRB could have properly judged the severity of the incident without understanding Mr. Topping’s disorder and its role in his outburst. Hence, the GRB had the obligation to consult a physician during the GRB hearing in order to better educate itself about Mr. Topping’s disorder. That Mr. Topping himself did not call a physician to the hearing is not an excuse, the GRB had a positive obligation to seek out understanding about bipolar disorder so that they could be sure that all reasonable accommodations had been made and that they were not unnecessarily punishing someone for being disabled.
Woigixate requires attempting to understand someone’s condition to the best of one’s ability so that one can avoid inaccurate biases and unnecessary labeling and stigmatizing. The GRB admitted that they did not understand Mr. Topping’s disorder, but they terminated him nonetheless without seeking to understand his problem. This summary dismissal violated the standards for the treatment of disabled people set down in the Ho-Chunk constitution and codes, which require that the disabled be given the same rights as all other people to seek employment and to not be deprived of that employment without due process. The purpose of due process and the GRB is to make sure that an employee is not terminated without cause. If the GRB does not understand a disability for which a person is being fired, there is no way that they can ensure that he not being fired without cause. Thus, due process for a disabled person requires that those responsible for making the decision to terminate be educated about the disabled person’s condition.
CONCLUSION
For this reason, in order for a disabled person’s discipline to be considered progressive, his disability should be taken into consideration in an informed manner every time he is disciplined for an incident that might have been affected by his disability, including when he is terminated. If the termination is appealed to the GRB, the GRB has a duty to summon a physician to the hearing to discuss the disabled person’s condition. This case is remanded to the GRB for them to reconsider taking his disability into consideration in consultation with a licensed physician.
*395 The court does not reach issues three and four.
REVERSE AND REMANDED with instructions.
EGI HESKEKJET.

. “Bipolar disorder, also known as manic-depressive illness, is a brain disorder that causes unusual shifts in mood, energy, activity levels, and the ability to carry out day-today tasks. Symptoms of bipolar disorder are severe. They are different from the normal ups and downs that everyone goes through from time to time. Bipolar disorder symptoms can result in damaged relationships, poor job or school performance, and even suicide. But bipolar disorder can be treated, and people with this illness can lead full and productive lives....
People with bipolar disorder experience unusually intense emotional states that occur in distinct periods called ‘mood episodes.' An overly joyful or overexcited state is called a manic episode, and an extremely sad or hopeless state is called a depressive episode. Sometimes, a mood episode includes symptoms of both mania and depression. This is called a mixed state. People with bipolar disorder also may be explosive and irritable during a mood episode.
Extreme changes in energy, activity, sleep and behavior go along with these changes in mood. It is possible for someone with bipu-lar disorder to experience a long-lasting period of unstable moods rather than discrete episodes of depression or mania.
A person may be having an episode of bipolar disorder if he or she has a number of manic or depressive symptoms for most of the da\. nearly every day, for at least one or two weeks. Sometimes symptoms are so severe that the person cannot function normally at work, school, or home.” National Institute of Mental Health, Bipolar Disorder, U.S. Department of Health and Human Services, 2008.

. Chief Justice Hunter would like to withdraw her January 16, 2010 letter stating that she is related to Daniel Topping. Chief Justice Hunter is not in fact related to Mr. Topping.

. The Ho-Chunk Nation Suspend/Terminate Approval Form and the Ho-Chunk Nation Disciplinary Action both bear two dates. The dates by the signatures are for June 10, 2008. However, the dates at the tops of both pages are June 9, 2008. Presumably these dates represent the time at which Mr. Topping’s supervisors began to fill out these forms in order to terminate Mr. Topping.